## BUFFALO UNION FURNACE CO. v. UNITED STATES SHIPPING BOARD EMERGENCY FLEET CORPORATION.

(District Court, W. D. New York. February 13, 1922.)

1. **United States ⟨key⟩125—Fleet Corporation subject to suit.**

   The United States Shipping Board Emergency Fleet Corporation is subject to suit as a corporate entity.

2. **Shipping ⟨key⟩3½, New, vol. 8A Key-No. Series—Contracts for material by Fleet Corporation terminable at close of war.**

   A contract for the purchase of pig iron for ship construction purposes, made during the war by the United States Shipping Board Emergency Fleet Corporation, contained an implied condition that it was subject to termination by the corporation when the war ended.

At Law. Action by the Buffalo Union Furnace Company against the United States Shipping Board Emergency Fleet Corporation to recover on contract. Judgment for defendant.

Rehearing denied 280 Fed. 751.

Slee, O'Brian & Hellings, of Buffalo, N. Y. (Frederick C. Slee and Dana B. Hellings, both of Buffalo, N. Y., of counsel), for plaintiff.

Stephen T. Lockwood, U. S. Atty., of Buffalo, N. Y., and Eldred E. Jacobsen, Asst. Counsel U. S. Shipping Board Emergency Fleet Corporation, of Brooklyn, N. Y., for defendant.

HAZEL, District Judge. On June 12, 1918, the defendant, United States Shipping Board Emergency Fleet Corporation, gave plaintiff an order for delivery of 1,250 tons of pig iron at specified prices and terms of delivery. The order was accepted and plaintiff began the performance of the contract. Afterwards all of the pig iron was delivered, except 395.54 tons, and payment made for the quantity delivered. On January 13, 1919, defendant canceled the contract, and upon failure to make adjustment to the plaintiff this action was brought to recover the balance due on account of the undelivered iron.

The defendant contends preliminarily, first, that the action is in fact against the United States, and hence the court is without jurisdiction; and, second, that it does not lie, since impliedly the contract was based upon the continued requirement by the government of the iron ordered for ship construction, and that it automatically ceased when the government no longer needed it for the intended purpose, to wit, when the Armistice of November 11, 1918, became effective.

There was evidence that when the iron was ordered the defendant had contractual relations with the American Condenser Company to construct condensers for different classes of ships in course of construction for defendant by independent contractors and that the iron in question was used for condensers for such ships. It does not appear that plaintiff was apprised of the intended use of the iron or of any existing contract with the American Condenser Company. Not all the iron was used to construct condensers, some being shipped by defendant to Dollar & Co., a concern engaged in shipping on the Pacific Ocean. The significance of the diversion to the latter of a part of the

⟨key⟩For other cases see same topic & KEY-NUMBER in 'all Key-Numbered Digests & Indexes
283 F.—43

iron is, as plaintiff claims, that it is thereby established that the iron ordered of plaintiff was not altogether required for war and governmental purposes, or for ship construction, and therefore the contract must be treated as an ordinary commercial contract.

[1] 1. The defendant corporation in my opinion is subject to the jurisdiction of this court. It was incorporated for a specific purpose on April 16, 1917, under the general laws of the District of Columbia (chapter 18, subc. 4) pursuant to an Act of Congress passed September 7, 1916, amended July 15, 1918, and commonly known as the Shipping Act of 1916 (Comp. St. Ann. Supp. 1919, § 8146a et seq.). In conformity therewith the defendant corporation was organized through presidential appointment and confirmation by the Senate of its members. Its object and purpose was to purchase, construct, equip, lease, maintain, and operate vessels in the commerce of the United States and for other lawful purposes. That Congress regarded the act as one of emergency is plainly perceivable from the provisions of the Deficiency Act of June 15, 1917 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115¹/₁₆d), which empowered the President, through the governmental agency of the then existing Shipping Board, to place orders for ships or materials as he might determine and deem necessary during the period of the war. The Supreme Court in the Lake Monroe, 250 U. S. 246, 39 Sup. Ct. 460, 63 L. Ed. 962, decided that the defendant corporation is a separate legal entity and amenable to the process of the District Court; and in Gould Coupler Co. v. U. S. Shipping Board (D. C.) 261 Fed. 716, Lord & Burnam Co. v. U. S. Shipping Board (D. C.) 265 Fed. 955, Ingersoll-Rand Co. v. United States Shipping Board Emergency Fleet Corporation, 195 App. Div. 838, 187 N. Y. Supp. 695, and Ingram Day Lumber Co. v. U. S. Shipping Board (D. C.) 267 Fed. 283, it was substantially held that the defendant is subject to suit in the District Court like other corporations created under the laws of the District of Columbia. I think these decisions correctly state the law.

[2] The next question is whether the fulfillment of the contract was enforceable after hostilities between the warring nations ceased. In my opinion it was within the contemplation of the parties, when the order for the iron was accepted, that the contract would become abrogated upon termination of the purpose for which it existed. The principle invoked by the government of an implied condition by which it became relieved or excused from its obligation upon the termination of the necessity for ship construction of the undelivered iron when it was without fault is fairly established in law. It seems to me reasonably clear that the fulfillment of the contract depended upon the duration and continuance of the war. Indeed, the power given the President to place orders for shipping material was limited to requirements during the war, and the implication of dependency upon conditions existing at the time the contract was made is essential to its full performance. This principle was applied in The Claveresk, 264 Fed. 276, by the Circuit Court of Appeals for this circuit; Judge Hough, writing for the court, saying:

"Indeed, we cannot think the doctrine new except in phraseology and application; for it is elementary that among the ways in which any contract

ends and is dissolved is the cessation of existence of some thing, condition, or state of things, upon the continued existence of which the contract was known to depend, provided such cessation of existence arises without fault in either contracting party."

In Texas Co. v. Hogarth Shipping Co. (D. C.) 265 Fed. 375, Judge Hough had previously said:

"Wars, and the demands and destructions of war, do not change the law in one sense; but in another they do, by multiplying and enforcing circumstances showing the need of change—of modernization. Without war, there had come to be recognized (inter alia) two well-known grounds of dissolution by impossibility—destruction of subject-matter without any one's fault, and failure of mutually contemplated means of performance. Under these heads the Great War only furnished innumerable instances and applications." Certiorari granted by Supreme Court, 254 U. S. 625, 41 Sup. Ct. 15, 65 L. Ed. 445.

These cases, it is true, were in admiralty, wherein the doctrine of "frustration of purpose" is not infrequently applied, but its application is not limited to maritime litigation. 13 Corpus Juris, 641. There are numerous adjudications where parties were excused from performance upon the presentation of conditions rendering full performance by either party impossible and discharging both parties from any obligations thereunder. See Edward Maurer Co. v. Tubeless Tire Co. (D. C.) 272 Fed. 990; Berthoud v. Schweder, 31 Times L. R. 1915 Eng. 404; Stewart v. Stone, 127 N. Y. 500, 28 N. E. 595, 14 L. R. A. 215. It is therefore held herein that at the time of making the contract in question there was an implied condition by which the defendant Shipping Board was relieved from performance with respect to any undelivered iron, when hostilities of war ceased and its complete fulfillment depended upon the existence of the conditions which rendered it necessary to contract for the material.

Plaintiff's contention that some of the material was shipped by the government to Dollar & Co., who may have had connections with Japanese government's activities in shipbuilding, or that ships built by defendant are now engaged transporting freight from which damages may be paid, is not believed of material importance. It does not overcome the presumption that the pig iron for condensers was to be used for the purposes and necessities of the war and in contemplation of the acts of Congress creating the defendant corporation or the implied termination of the contract when the war ceased.

The complaint is dismissed, with costs.